Dis; entino Opinion.
Mabr, J.
After the most careful consideration, I am unable to concur in the opinion of the majority of the court. The questions involved are of frequent occurrence ; and they seriously affect the rights of the citizens of our own State, and of other States, who are peeuniarly interested in property which is sent to this market for sale or for other purposes. I am constrained, therefore, to state, at some length, the reasons for my dissent.
On the 29th of March, 1876, Ernest Heyner, a planter, residing in Chicot county, Arkansas, executed, in favor of Frank & Co., merchants, doing business at Sunnyside, in the same county, a mortgage on the crop of cotton to be grown, in the year 1876, on the plantation cultivated by him, and on certain mules and other personal property on the place, to secure what might be due to Frank & Co. on open account for advances and supplies and two promissory notes, bearing ten per cent interest from maturity, one for $2129 46, which had matured 1st of December, 1875, and was extended to 27th November, 1876, the other for $2500, to become due 29th November, 1876, touching which last mentioned note it was stipulated that if Heyner should not be able to pay it in full at maturity, on paying half .the residue should be extended for one year: and it was further stipulated that Heyner should ship the cotton for account of Frank & Co. to a responsible factor at New Orleans, to bo selected by him. This mortgage was acknowledged by Heyner and filed for record on the day of its date ; and it was recorded in the proper office in Chicot county.
On the 10th of July, 1876, Heyner executed an instrument in writing which was also acknowledged by him, filed for record, and recorded on the day of its date in the same office, granting a lien and privilege in favor of Chaffe & Sons, factors and commission merchants of New Orleans, on the entire crop of every kind, grown on the same plantation, during the year 1876, to secure advances and supplies for that year, estimated not to exceed $2000: and he obligated himself to ship to Chaffe & Sons from time to time as it might be ready for market, “all of the cotton I control of the crop of 1876,” and to allow two and a half *603 per cent commission on all sales, purchases, advances, acceptances and endorsements, and interest at eight per cent per annum.
In November, Heyner delivered to Frank & Co., in their store yard, at Sunnyside, fifteen bales of the cotton grown on the plantation, which he requested them to keep until he should have more cotton ready for shipment: and on the 8th of February he delivered to Jacob Frank, of the firm of Frank & Go., at the gin house, on the plantation, ninety-five bales. The road to Sunnyside was then bad : and Frank requested Heyner to have these ninety-five bales “ boated ” across the lake on which the plantation is situated, to Yaucluse, a river landing in the same county. Heyner agreed to do this ; and part of the cotton was put on the boats that day, while Frank was present, to be taken to Yaucluse. Heyner told Frank that he had cotton to ship for his own account ; and that he would ship the ninety-five bales for account of Frank & Go. at the same time. He also told Frank 'that he wished the whole to be consigned to Chaffe & Sons, in order that they might have the benefit of the commissions ; and Frank agreed to this.
The fifteen bales were weighed by Starling, and were designated by the numbers one to fifteen ; and the ninety-five bales were' weighed by Heyner, and the weights exhibited to and accepted by Frank. They were designated by the numbers sixteen to one hundred and ten.^
On the 11th of February, Heyner shipped on the steamer Pargoud at Yaucluse, under one bill of lading, consigned to Chaffe & Sons, the ninety-five bales, 16 to 110, expressed in the bill of lading to be for account of Frank & Co., and seventy-six bales, 111 to 186, expressed in the bill of lading to be for account of the shipper, Heyner. A clerk of Frank & Co. testifies that he went on board the boat, knowing of this shipment, and took a copy of the bill of lading: and on the same day Frank & Co. shipped at Sunnyside, on the same boat, the fifteen bales, one to fifteen, for their own account, consigned to Chaffe & Sons.
The Pargoud arrived at New Orleans at an early hour in the morning of the 15th February ; and the bills of lading were probably delivered to Chaffe & Sons from eight to ten o’clock. During the morning a bill was presented for something over $3000, drawn by Frank & Co. on Chaffe & Sons against the 110 bales. It does not appear distinctly whether the attention of Chaffe & Sons had been specially called to the bills of lading before they had knowledge of this bill; nor is it material to inquire. They took legal advice, and refused to honor the bill; and they gave'notice to the boat, between twelve and two o’clock, that they would receive and pay freight and charges only on the seventy-six bales shipped by Heyner for his own account. They also gave notice at the press that the 110 bales were not to be received and stored for their account, but for account of the boat, or whom it might concern.
*604 In the meantime, before he knew that there was aDy trouble about the cotton, the press drayman had hauled off the greater part of it to the press at which cottons consigned to Chaffe & Sons were stored. Chaffe & Sons immediately brought suit against Heyner to recover the ¡amount due them for advances, some $7000, to be credited with the proceeds of the seventy-six bales when sold; and they attached the 110 bales as the property of Heyner as soon as the last of the lot reached the press.
Heyner answered by general denial; and Frank & Co. intervened, claiming to be the owners of the 110 bales; and they alleged that Chaffe ■& Sons had accepted the consignments, and could not attach. The fifteen bales shipped at Sunnyside were subsequently released by Chaffe & Sons; and as between themselves and Frank & Co. the controversy is limited to the ninety-five bales shipped at Yaucluse. The issues between Chaffe & Sons and Heyner will be first considered..
Heyner’s gin house was destroyed by fire ; and this caused some delay in getting his crop ready for market. He owed Frank & Co. some ¡$6500, of which $5200 were due, the residue having been extended. His crop was short; and the 186 bales shipped on the 11th of February, •soon after he had finished ginning and baling, constituted the whole.
Chaffe & Sons sold the seventy-six bales, and carried the proceeds to the credit of Heyner under date of 26th February; and they made up the account to 11th of May, showing balance in their favor $3480 37, including a draft accepted by them to mature 3d June. The district judge excluded the interest charged and credited subsequently to the 15th February, and thus reduced the balance to $3420 14, for which he rendered judgment in favor of Chaffe & Sons, with interest at five per cent from judicial demand, 16th February, and lien and privilege on the ninety-five bales attached: and Heyner and Frank & Co. appealed ■separately from this judgment.
Heyner’s counsel complains that there are illegal charges in the ■account, and that interest up to 16th February should have been calculated at five per cent, because there is no written evidence of an agreement to pay a higher rate. They particularize the commission for advancing and excess of interest, amounting, according to their figures, to $161 40; and they claim that this amount should be deducted from ■the $3480 37, which will make plaintiffs’ claim $3318 96.
The first item in the account is under date of 20th July, ten days after the date and recording in Chicot county of the instrument granting to Chaffe & Sons a lien and privilege on the crop. The account was kept in conformity to that instrument, which was produced and offered In evidence by Chaffe & Sons. Interest was charged at eight per cent •on each entry to the debit, and -two and a half per cent for accepting *605 and for advancing. The first account was brought down to the 21st December, and the aggregate of principal, interest and commissions was carried into the second account, which was brought down to the 15th of February.' The aggregate of this second account was carried into the third and final account, in which the only credit figures, $3550 17, proceeds of the seventy-six bales, on which interest at eight per cent is-allowed and credited from the 26th February to 11th May, when it closes with the balance $3480 37 in favor of Chaffe & Sons. These three accounts were signed, as usual; but it does not appear whether or not they were delivered or sent to Heyner.
The mere charging of interest and commissions in an accountwouldS not prove an agreement to pay them; but the merchants of New Orleans for years past have charged the highest rate of conventional interest, besides the commission for accepting and for advancing ;'and where knowing, as all planters who ship their crops to New Orleans for sale must know, that these charges will figure in the accounts, if the debtor promises, in writing, before the account is opened, to allow them, the agreement is perfect. The written promise signed by Heyner was incohate: it was merely a proposition in support of his application to Chaffe & Sons for advances and supplies; and'it was completed and became an agreement by the subsequent acts of Chaffe & Sons. It is written evidence of the fixing of interest at eight per cent, and a commission of two and a half per cent for advancing.
This instrument was not introduced for the purpose of establishing a lien on the cotton, and Chaffe & Sons set up no lien except that which results from the attachment. It may be that so much of this instrument as pertains to the lien and privilege, the security for the debt about to be contracted, would be controlled by the law of Arkansas; but as Chaffe & Sons do not claim any lien under it, it is not necessary to inquire what effect would be given to it by the law of Arkansas. There is no doubt that all the stipulations with respect to the interest and commissions to be charged and allowed fall under the law of Louisiana, the locus solutionis; and the effect is to be determined by that law. The law of Arkansas allows conventional interest at ten per cent; and it declares void contracts, obligations, and conveyances in which a higher rate is reserved and agreed upon.
It is well settled in our law that the commission of two and a half per cent for selling and for purchasing, and for accepting, and for endorsing, is lawful. It is a compensation for services and for risk; and it is in no sense additional interest. It is equally well settled that the commission of two and a half per cent for advancing is additional interest; and that it is usurious and cannot be allowed where the highest rate of conventional-interest is charged. See Lalande vs. Breaux, 5 An. 505.
*606 By the act of 1844, p. 15, re-enacted in 1855, p. 352, and again in Rev. Statutes of 1870, p. 373, sec. 1884, art. 2895 of the Civil Code was amended so as to reduce conventional interest from ten to eight per cent; and a higher rate was prohibited under penalty of forfeiture of the entire interest so contracted. If paid by the debtor he might recover it by suit brought within one year.
It has been supposed by some that the act of 1850, p. 130, allowed the recovery of eight per cent where, in a negotiable note, or written ■evidence of debt, or obligation to pay money, transferable by assignment, a higher rate was stipulated. In Crane vs. Beatty, 15 An. 329, it was decided, after much deliberation, that this act related exclusively to the sale and discount of notes and other written evidences of debt; and that it did not protect the creditor who took the note of his debtor and included usurious interest in the amount for which it was given : and this decision was affirmed in Campbell vs. Hilliard, 15 An. 537.
By the act of I860, p. 41, the owner of a note payable to bearer or to order, or of a written evidence of debt or obligation for the payment of money, transferable by assignment, could recover the whole amount, the face of the instrument, notwithstanding that a greater rate of interest or of discount than eight per cent might have been included in it: “Provided such obligations shall not bear more than eight per cent interest per annum after their maturities until paid.”
The compilers of the Revised Civil Code have omitted the penalty of forfeiture; but they have retained the right of the debtor to recover usurious interest which he has paid; and they have embodied the acts of 1850 and 1800 as separate clauses of art. 2924, which takes the place of art. 2895 of the Code of 1825. In the Revised Statutes the penalty of forfeiture, and the right of the debtor to recover usurious interest which lie has paid, are retained and re-enacted, the first as section 1884, the second as section 1885; while the act of 1856 is omitted ; and the act of 1860 is re-enacted, first as section 337, p. 70, and again as section 1889, p. 374.
Fortunately there is no conflict in these several expressions of the legislative will. The Revised Code and Statutes forbid a higher rate of interest than eight per cent; they both authorize the recovery of usurious interest that has been paid; and they both re-enact the act of 1860. The Revised Code alone retains the act of 1856; while the Revised Statutes alone retains the penalty of forfeiture of the entire interest where the rate contracted for is above eight per cent. Of course, that which the Code allows the debtor to sue for and recover if he have paid it, could not be allowed against him at the suit of the creditor if he should set up the defense, and establish it by proof. The courts cannot •supply the plea of usury; but where the defendant, sued on an account, *607 pleads a general denial, and the exhibition of the account, and other evidence in the cause, show that there was an agreement in writing for a higher rate than eight per cent the general issue would suffice.
The act of 1856 did not relate to the owners in general of notes, etc., but was restricted to the purchaser or discounter; while the act of 1860 seems, by its terms, to be applicable to any owner, whether one of the original parties or a subsequent holder, by purchase or by discount. Both acts contemplate cases in which the interest to maturity, stipulated at a higher rate than eight per cent is capitalized; and included in the sum for which the note is given, and neither the one nor the other intended to legalize, or to save from the penalty of forfeiture of the entire interest stipulated, any contract by which a higher rate than eight per cent was fixed and expressed in the instrument itself.
This discussion may not be altogether useless, in view of the fact that the idea prevails, to some extent, that one may safely contract for any rate of interest, because, while a higher rate than eight per cent cannot be allowed, the only penalty is the forfeiture of the excess above ■that rate. The several acts of 1844, 1856, 1860, have passed into the revisions of 1870, with the meaning and effect which they had originally. It is not necessary to express any opinion now as to what their effect would be, as between the original contracting parties, where interest above eight por cent has been included as part of the capital sum, and a note given for the aggregate amount, in the settlement of an ordinary debt. In the case with which we are now dealing the law is positive : the penalty is the forfeiture of the entire interest; and the creditor can recover only the capital sum. There is no reason why the judgment in such case should not bear legal interest from judicial demand, if the debt was then due; or from maturity, if the debt was not then due.
Footing the items we find charged in the account for commissions on advances $144 01, and interest to 15th February $146 25, aggregating $284 26. To this add $8550 17, proceeds of the seventy-six bales, and we have total credits or deductions $3834 43. The cash debits are $6092 31, to which must be added acceptance due 3d March, $230, and one due 3d June, $648, making total debits $6970 31. Deducting total credits as above, $3834 43, there remains a balance of $3135 88, for which Chaffe & Sons are entitled to judgment against Heyner, with interest at five per cent on $2257 88 from the 16th February: like interest on $230 from the 3d March; and like interest on $648 from 3d June, 1877, until paid.
It remains now to consider the case as between Chaffe & Sons and Frank & Co. The evidence shows that Chaffe & Sons, within a reasonable time after they received the bills of lading, determined not to accept the consignments of the fifteen bales and the ninety-five bales ; *608 and that they sufficiently declared that determination by the notices to-the carrier and at the press. There may be some question as to the effect of the receipt of the cotton on the levee by the drayman; and also as to the right of Chaffe & Sons to accept the consignment in part, and to reject it in part. These questions will be considered in their order.
Cotton factors in New Orleans' do not employ the draymen, nor do-they pay them. They make their arrangements and contracts with the proprietors of the cotton presses for the receiving, hauling, handling and storing of cottons consigned to them. The proprietors of the presses employ the draymen; and one is designated to haul for each factor storing at the press at which he is employed. On the arrival of a boat at New Orleans the proprietors of the drays, “Boss Draymen,” as they are called, or their clerks, go on board and take from the manifest lists of the cottons consigned to factors storing at the presses at which they are, respectively, employed; and as the bales come out and are discharged and separated on the levee, they receive and haul them off. These draymen have no special instructions from the factors, nor do they require any. When the list of a "factor is completed, the drayman gives a receipt to the discharging clerk showing the condition of the cotton at the time he received it; and on the faith of this receipt the factor settles with the carrier, and pays the freight and charges as expressed in the bill of lading.
These draymen are not the employees of the factors; and they have no power to bind the factors, except that a delivery to them of the cotton discharged from a boat or vessel would be, as between the carrier and the factor, a delivery to the factor, the consignee. What the dray-man did with respect to the cotton in question is precisely what he would have done with respect to any other cotton consigned to Chaffe & Sons, touching which no special instructions had been given to him. It must often happen that an entire consignment to a factor has been received by the drayman and hauled to the press before- the factor has examined the bill of lading, or even knows that such a consignment has been made. It was optional with Chaffe & Sons to accept or to-reject the consignment; and what the drayrpan did was without legal consequence as to them.
Much of the cotton that comes to New Orleans, especially that which is not grown immediately on the rivers and shipped at the plantation landings, is hauled to convenient landings, and is there shipped by warehousemen and other shipping agents, according to the instructions of the owners. It frequently happens that such shipping agent has many bales, of different marks, belonging to different persons, all to. be consigned to one factor. In such cases it is most convenient, and it is usual, to ship them all under one bill of lading, which begins with the *609 words “shipped by,” etc.; these words indicating simply the person by whom the shipment was actually made, and not the person or persons who own the cotton. As in this case, in one column are the marks and numbers: in another column is a description of the articles, so many bales of cotton, corresponding with the marks and numbers; in another the names of the persons for whose account, respectively, each lot is-shipped; and in another, the charges on each lot. In such eases each lot may be regarded as a_ separate consignment, by each person, for whose account the shipment is made; and practically, there is no difference, so far as the rights of all persons whomsoever are concerned, in such a case and that in which each lot is shipped under a separate bill of lading.
No doubt Heyner would have shipped the ninety-five bales under & special bill of lading, if he had suspected that Chaffe & Sons would reject the consignment, and treat these ninety-five bales as his property. And here a serious question of the law of agency arises. The consignee is the agent of the owner of the property. If he have liens and privileges, by reason of his advances on the special shipment, or for a genral balance, this fact in no manner affects his relations to the owner or to the property. He is still the agent of the owner, bound as such to obey his instructions, with the right to retain, as against the owner, for his advances or general balance. If the owner, in making the consignment has appropriated the property, and directed his agent,, the factory to dispose of the proceeds for other purposes than the payment of hi's general balance, the factor, the agent, must either accept the consignment and obey the instructions of his principal; or reject it, and subject the property by attachment or otherwise, if his rejection and refusal to accept the agency would have the effect of remitting the property into the possession or control of his debtor, the owner.
If this shipment could, by the terms of the bill of lading, be treated as two separate consignments, then there were two consignors, Heyner, who shipped seventy-six bales for his own account, and Frank & Co. for whose account Heyner shipped the ninety-five bales. If the whole be treated as one consignment by* Heyner of his property, Chaffe & Sons could not accept the agency with'respect to a part only of the property, that which they were instructed to receive for account of Heyner, and reject it as to part of the property, that which they were instructed to receive for account of Frank & Co.; and it is only upon the hypothesis that there were two consignments, by . two different consignors, that Chaffe & Co. could have refused the agency with respect to the ninety-five bales, and accepted it for the seventy-six bales. In other words, the ninety-five bales had ceased to be the property of Heyner, and Chaffe & Sons were not his agents with respect to them ; or Heyner was *610 the owner of the ninety-five bales and of the seventy-six bales. If the first hypothesis be true, then as the ninety-five bales were not the property of Heyner, they were not subject to attachment as his property; if the second hypothesis be true, Chaffe & Sons could not attach, because they could not accept the agency and obey the instructions of the principal with respect to a part of his property, and refuse to accept it with respect to the remainder, because the contract would be one and indivisible.
The rights of Frank & Co. are based, primarily, on the mortgage of 29th March, 1876, and the delivery made to them under that mortgage ; and the nature and extent of their rights must be tested by the law of Arkansas, the locus of the contract of mortgage, the situs of the mortgaged property, the domicile of the mortgagor and the mortgagee, the place at which the delivery under the mortgage was made.
The laws of Arkansas were introduced in the court below, the judge says for one purpose, the counsel for Frank & Co., in the motion for a new trial, say for another purpose; and they were referred to by counsel for both parties in this court. It is not material to inquire for what purpose they were introduced ; since it is manifest that they were considered and passed upon by the district court. It is our province and our duty to ascertain, if we can, what the law of Arkansas is, and to use and apply it in determining the rights of the parties dependent upon it, without regard to the real or supposed purpose for which it was introduced. '
We know that the common law is the basis of the system in Arkansas; and that, in that State, personal property is susceptible of mortgage, as it is in the other States in which the systems are derived from the same source; that there has been some diversity of opinion as to the effect of a mortgage of a crop to be grown, or any other thing not in esse; and that the weight of authority is that, although a mortgage or other conveyance of that which does not exist is without effect at the time, it becomes operative and effectual when the thing does exist and becomes the property of the grantor.
Counsel for Frank & Co. refer us to a statute of Arkansas, passed in 1875, which authorizes the mortgage of a future crop; but as a copy of that statute has not been furnished,' recurrence must be had to general principles which are applicable in all the States which are designated as common law States.
Under our law, a hope, or expectation, a chance, as the cast of a net, the young of animals not. yet born, may be sold. R. O. C. arts. 2450, 2451. These objects may not be mortgaged with us, but that is simply because movable effects are not susceptible of mortgage by our law. R. O. C. art. 3289. That which can be sold and conveyed in Arkansas *611 •■and the other States, may be mortgaged; and there is no reason why a thing not in esse may not be mortgaged or otherwise conveyed, subject, of course, to the condition that the mortgage or other conveyance will be without effect if the thing should not come into existence as contemplated by the contracting parties.
The decisions of the Supreme Court of the United States are a safe guide for us in determining the general rules regulating rights and property in the other States. In Pennock vs. Coe, the question was as to the effect of a mortgage granted by a railroad company on its road not yet built, and locomotives and rolling stock not yet purchased. Judgment creditors, holders of bonds secured by second mortgage, seized under execution, a portion of the rolling stock in actual use on the road, and which had been put upon it before the date of the second mortgage; and the execution was enjoined by the first mortgagee.
Delivering the'opinion of the court, Justice Nelson laid down the rule, which cannot be questioned, that a mortgage or other conveyance, in prcesenti, of that which one has not, or which does not exist, is an impossibility; and that such conveyance would be inoperative and void. But that was not the case before the court. “ The ease here is, not whether a person can grant in prcesenti property not belonging to him, and not in existence, but whether the law will permit the grant or conveyance to take effect upon the property when it is brought into existence, and belongs to the grantor, in fulfilment of an express agreement, founded on a good and valuable consideration.” 23 Howard, 128.
After reviewing the decisions of the English and American courts, the conclusion is thus stated : “We are satisfied that the mortgage attached to the future acquisitions, as described in it, from the time they come into existence,” p. 130: and the decree accordingly maintained the superiority of right of the first mortgagee.
In Dunham vs. R. Company, 1 Wallace, 254, the proposition was stated and argued, that “ nothing can be mortgaged that is not in esse, and that does not, at the time of making the mortgage, belong to the mortgagor,” p. 259. The court, maintaining the validity of the mortgage, referred to Pennock’s case, 23 Howard, “ where the rights of the parties depended upon the general rules of law,” as conclusive. P. 267.
In Butt vs. Ellett, 19 Wallace, 544, the question was between the transferee of a note secured by mortgage on a crop to be grown, and factors in the city of New Orleans, charged with knowledge of the mortgage, to whom the mortgagor was largely indebted for advances, and to whom he shipped the whole crop. This mortgage was granted on the 15th January, 1867, at a time when such a mortgage was not specially authorized, as it has been subsequently, by the laws of the State of Mississippi in which the plantation was situated. The doctrine was *612 pressed upon the court that the mortgage of a crop not in esse, the seeds of which were not yet in the ground, was void. The court decided that “ when the crop grew the lien attached. That the cotton went into the hands of Butt & Co., the factors, impressed with this lien, and that when they sold it they took the proceeds in trust for the benefit of the mortgagee, and were liable to him for the amount.” P. 547.
It is wholly immaterial, therefore, whether there is a statute of Arkansas specially authorizing the mortgage of a crop to be grown. It-is probable part at least of the seeds were in the ground on the 29th of March, when the mortgage was granted. Be this as it may, if the statute authorized the mortgage it would be inoperative, without effect, until and unless a crop was grown. If there was no such statute, the mortgage would be equally inoperative so -long as there was no crop; and in either case, the lien would -attach when the crop came into existence and grew.
Some stress is laid upon the fact that Prank & Co. do not claim as mortgagees, but as owners of the cotton; and a bill of exceptions was-reserved to the ruling of the district court in admitting proof of the mortgage.
This objection rests upon a misapprehension of the relations of the mortgagor and mortgagee, respectively, to the property mortgaged. The legal title is in the mortgagee, by the terms of the mortgage, which is in the usual form, an absolute conveyance with a condition of defeasance; and the mortgagor has only the equity of redemption by paying-the mortgage debt. Before the maturity of the debt, in the absence of á sipulation to the contrary, or the manifestation of a different intention by the terms of the mortgage, the mortgagee might sue at law and recover the possession. See Kennady vs. McCarron, 18 Arks. 170, citing 4 Kent 154; Jameson vs. Bovee, 6 Gill & Johns, 74; Hartshorne vs. Hubbard, 2 N. Hamp. 453. See, also, 2 Blackstone, 158.
In Conard vs. At. Ins. Co., 1 Peters, 441, the court treated the proposition “ that a mortgage is a conveyance of- property, and passes it-conditionally to the mortgagee,” as too plain to require the support of authority.
In Gibson vs. Stevens, 8 Howard, Gibson a merchant of New York, made advances to McQueen on pork and flour in warehouses in Indiana; and McQueen transferred to Gibson the evidences of his title, and gave him orders on the warehouse men, who were the vendors of McQueen, for the delivery of the property. Stevens, sheriff of Allen county, Indiana, had part of the property in possession, under attachment, at the suit of creditors of McQueen, levied after the transfer to Gibson, but-before the warehouse men had notice of the transfer. Delivering the-opinion of the court, Chief Justice Taney said the legal title was in- *613 Gibson, and McQueen had only an equitable interest in the surplus, if any remained, after satisfying Gibson: and he quoted, approvingly, what Judge Story said, delivering the opinion of the court in Conard vs. At. Ins. Oo., I Peters: “ It is true that in discussions in a court of equity a mortgage is sometimes called a lien for a debt. And so it certainly is; and something more: it is a transfer of the property itself as-security for the debt.”
Again, at page 401, the Chief Justice said: “It will scarcely be contended that the attaching creditor, or a purchaser under the attachment, or the officer levying it, could maintain an ejectment against the mortgagee in possession, or in any other way interfere with his possession, when holding it as security for money due him. The same rule applies to a mortgagee of personal property, holding the legal title and possession to secure his advances.”
In Holliday vs. Hamilton, 11 Wallace 561, Sherwood, Karnes & Co., merchants of St. Louis, bought of Holliday Brothers, of Cairo, a lot of corn, at a landing between St. Louis and Cairo, for which a steamboat agent gave a bill of lading at St. Louis. Sherwood, Karnes & Co., drew a bill of exchange on Hamilton & Dunnica of New Orleans, the consignees; and it was negotiated at St. Louis, and sent forward with the bill of lading, by mail, to the consignees at New Orleans, who accepted and paid the bill. The boat, on her way from St. Louis to New Orleans, took the corn on board. Before she reached Cairo the purchasers, Sherwood, Karnes & Co. failed; an'd when the boat arrived at Cairo, Holliday Brothers, the vendors, attached the corn for the unpaid price; and it was unladen from the boat, and sold under the attachment.
Hamilton & Dunnica sued Holliday Brothers in trespass, in the U. ■S..Circuit Court in Illinois; and the case went up to the Supreme Court of the United States.
Delivering the opinion of the court, Justice Davis said: “ If Hamilton & Dunnica had purchased the corn outright, they could not have got a better legal title to it than they acquired under the admitted facts of this suit. The legal title passed to them to carry out certain designated purposes; and they had the right to the undisturbed possession of it until those purposes were effected.” P. 564.
Again he said : “ It is argued that the bill of lading did not effect the transfer of the property, because when it was executed the corn had not been received by the transportation company. But it became operative as soon as the corn was in the custody of the boat; and the legal-relations of Hamilton & Dunnica to the property were fixed from that time.” P. 565.
This case fully supports the proposition that, whatever may have been the effect of the mortgage at the time it was executed, because the *614 crop was not then in esse, it became operative when the crop was grown, gathered, and ready for shipment to market. The legal relations of Frank & Co. to the property had certainly become fixed at that timer and this, as the court said in Dunham’s ease, 1 'Wallace, not in virtue of any special statute of the State, but on general principles, applicable to the contract.
A recurrence to the jurisprudence of Arkansas will show that it is in perfect accord with that of the Supreme Court of the United States. In Kennady vs. McCarron, one Norton had mortgaged certain furniture to Kennady. Norton being in default, by failure to pay the debt, Kennady demanded of him delivery of the mortgaged property. Norton pointed it out, in his house, and thus made a delivery. His wife was-sick at the time, and Kennady would not disturb her by removing the furniture. McCarron had recovered judgment against Norton, on which he caused execution to issue, under which the furniture in question was seized and sold by the sheriff, and purchased by McCarron; and Kennady brought suit against McCarron to recover the property. The Supreme Court of Arkansas said :
“We think, upon the facts of the case, the plaintiff had the legal title to the property, the immediate right of possession, and good ground of action against the defendant; and that the court below should have so declared the law to be.” 18 Arkansas, 171.
In Gilchrist vs. Patterson, 18 Arks. 575, Beardon mortgaged a slave, then personal property by the law Of Arkansas, to Norman to secure payment of a note. Norman transferred the note and assigned the mortgage to Rogers; and Rogers to Gilchrist. Beardon sold and delivered the slave to Patterson; and Gilchrist sued Patterson for the slave. The court said:
“ On the maturity of the mortgage debt, and default of payment, the mortgagee had, at law, the right of action for possession of the slave against Beardon, the mortgagor, or one holding under him. In equity, the mortgagor had the right of redemption.” P. 579.
The court also held that the right of action which accrued to Norman, the mortgagee, vested in Rogers, his transferee, and so in Gilchrist, the plaintiff, by transfer from Rogers.
When Frank & Co. in their petition of intervention claimed to be the owners of the cotton, in this case, they described their relation to the property in the terms used by the Supreme Court- of the United States, and the Supreme Court of Arkansas in analogous cases. They ascribed to the mortgage its true legal effect: they called the mortgagee, after default, just what the Supreme Court of Louisiana called him in Dobbin vs. Hewett, 19 An. 513. The legal title was in them by the terms of the mortgage. That title had become absolute by the default of the- *615 mortgagor; and the mortgagor had no longer the right to withhold the property from the mortgagee, as the court said in Kennady vs. McCarron. Frank & Co. might have sued Heyner, or any one in possession claiming under him, for the cotton itself, the entire crop. Heyner had simply the equity of redemption, or an equitable right to any surplus that might remain after satisfying the mortgage debt. Heyner could have resisted the suit of Frank & Co. against him for the entire crop only by a bill in equity to compel a sale and an account of the proceeds. There is some question as to whether a bill would lie for the foreclosure of a mortgage of chattels, in possession of the mortgagee, after default; and a resort to such proceeding would be idle where the value of the mortgaged property was not in excess of the mortgage debt, since the effect would be to diminish the realized value to be applied to the debt, to the prejudice and injury of the mortgagee, without the possibility of benefit to the mortgagor. Having the legal title and the possession the mortgagee could sell, and if any surplus remained, he would be accountable for it to the mortgagor.
The Supreme Court of the United States calls the merchant who has advanced on goods placed at his disposal the owner; it calls the transferee of a bill of lading for goods at sea the owner: it calls the consignee who has made advances on the faith of a bill of lading the owner; where the object of the transfer and of the shipment was to secure the debt due to the transferee or consignee. The Supreme Court of Louisiana, in Dobbins vs. Hewett, 19 An. 513, calls the mortgagee of a ship, after default, the owner; and the Supreme Court of Arkansas calls the mortgagee of personal property, after the maturity of the debt, the owner. Surely, any other judge or lawyer, dealing with property mortgaged in Arkansas, and in that State delivered to the mortgagee, after the maturity of the debt, may well call him the owner, and maintain his legal title and right of possession on proof of the mortgage and-the delivery under it.
The evidence of the delivery to Frank & Co. is complete. When Heyner had finished baling, Frank went to the gin house and demanded the cotton. He wanted a sufficient quantity to pay the mortgage debt, then over due for two months. Fifteen bales had already been delivered and were in the possession of Frank & Co. at Sunnyside; and it was finally agreed that ninety-five bales more should be delivered, which it was supposed would cover the debt, less the part of it which was extended. The weights of these ninety-five bales were exhibited to Frank by Heyner; and the estimation of their sufficiency was based upon the weights. There were then at the gin house 171 bales. The fifteen which had been delivered were numbered one to fifteen. It is manifest that the ninety-five bales were selected and designated by the numbers, as *616 well as by the weights, and that they were thus separated and distinguished from the seventy-six bales whioh Heyner, by agreement with Frank, retained for shipment on his own account. This is plain from the fact tliat the first bale of the lot delivered to Frank at the gin house was numbered sixteen, and the numbers followed, consecutively, up to and including number 110. This was not accidental: it did not happen by chance that the numbering of the 171 bales at the gin house began with the number sixteen to correspond with the numbers one to fifteen already delivered; and that in the ninety-five bales there was notone bale of the numbers 111 to 186. The 110 bales, numbered 1 to 110 inclusive, were thus distinguished from the seventy-six retained by Heyner, 111 to 186; and in the bill of lading the ninety-five bales stated to be shipped for account of Frank’& Oo. were the consecutive numbers 16 to 110 inclusive, while the seventy-six bales, stated in the same bill •of lading to be for account of Heyner, bore the numbers 111 to 186. So that there was not at any time, after the delivery to Frank, any mingling or confounding of the cotton which had thus been, originally, separated and distinguished by weights and numbers.
The delivery to Frank & Co. was as complete as if they had marked the bales, since they accepted them by the numbers and marks put upon them. By the Roman law the delivery was complete by putting the purchaser’s mark on the articles sold, Where they could not be immediately removed; and the property was thenceforth at his risk. Dig. 18, Tit. 6,1. 14,11; and the law of France is the same. Troplong, Yente, 1, No. 103. By our law, “if the obligation be to deliver an object which is particularly specified, it is perfect by the mere consent of the parties.” R. O. O. art. 1909.
“ The tradition or delivery of movable effects takes place either by their real tradition, or by the delivery of the keys of the buildings in which they are kept; or even by the bare consent of the parties, if the things cannot be transported at the time of the sale.” Art. 2478.
There is no system under which the weighing, counting and numbering of articles thus specified and designated, with the intention and consent of one of the parties to transfer and deliver them, and the intention and consent of the other party to receive them, does not operate a change of possession and of title, in accordance with the concurring will and agreement of the parties. The sufficiency of such delivery could not be questioned in Arkansas, where even symbolical delivery is recognized as completely as under our law. Locke vs. Chapman, 7 Arks. 197; Field vs. Simco, 7 Arks. 269; Burr vs. Williams, 23 Arks. 245; Pickett vs. Reed, 31 Arks. 131.
It is true that Heyner had possession, rather the custody, of these ninety-five bales after the delivery at the gin house; but this was a *617 qualified possession, .for a specific purpose. By the terms of the mortgage he was to ship the cotton for account of Frank & Co. to a factor in New Orleans to be selected by him. If this stipulation could be construed as giving to Heyner the right and power to sell the mortgaged property, this would have constituted him simpiy the agent- for Frank & Oo. Speaking of such a stipulation in a mortgage of goods, Parsons says: “ Supposing the whole transaction to be bona fide, the mortgagor would be considered as selling the goods as the agent of the mortgagee; and if sold on credit, the debt could not be reached by an attaching creditor of the mortgagor through the trustee process,” that is by garnishment. Contracts, vol. 1, p. 570.
Both parties understood that Heyner should have the possession of the crop up to the maturity of the debt; and before that time he was to have the right to ship it, not for his own account, but for account of Frank & Co.; and the object was to provide funds by sale of the mortgaged property to pay the mortgage debt at maturity. The maturity of the debt was at the end of November, when, ordinarily, the greater part of the crop.would have been shipped to market. When the debt had matured, and no part of it had been paid, and no part of the crop had been shipped to market, Heyner was in default; and he no longer had the right to claim the benefit of the conditions of the mortgage, nor to withhold the possession from Frank & Co., as the Supreme Court of Arkansas decided in Kennady vs. McCarron. Six months had elapsed since the beginning of the cotton picking, and more than two months since the maturity of the mortgage debt; and by his own default Heyner had lost the right to insist on the stipulations in his favor in the condition of defeasance. He and Frank both understood this perfectly; and when Frank went to the gin house, on the 8th of February, and demanded delivery, Heyner promptly consented, and did deliver the ninety-five bales, which he and Frank supposed would suffice, with the fifteen bales previously delivered, to pay all the mortgage debt except that part of it which they agreed should be extended.
The mortgage conveyed the legal title to Frank & Co.; the maturity of the debt and the default of payment entitled them to the immediate possession; the delivery by the marks, numbers, and weights gave them actual possession; and from that moment Heyner ceased to have the legal right or power to control, in any manner, the subsequent disposition of the property by them.
By the terms of the mortgage, the entire crop was to be shipped by Heyner, for account of Frank & Co.; but after default, after the condition had become absolute, the contract rights of the parties were modified by their consent. Only ninety-five bales of the whole crop were to be shipped by Heyner for account of Frank & Co.; and Heyner *618 •was to have the uncontrolled disposition of the remaining seventy-six bales for his own account. He desired to ship the whole crop to Chaffe & Sons, that they might have the benefit of the commissions; and he undertook to transport the ninety-five bales to Vaucluse Landing, and to ship them for account of Frank & Co. He was simply the agent for Frank & Co. for the special purpose of shipping the cotton; and that, not because it was so stipulated in the contract of mortgage, his part of .which he had failed to perform, but because, after the delivery at the gin house, Frank consented to this arrangement, at the request of Heyner.
It is not unusual to stipulate, -in mortgages and deeds of trust, that the property shall be sold without the intervention of justice, in the manner agreed upon; and our law permits this in the contract of pledge. B. C. C., art. 3165. Although by the delivery at the gin house, Heyner had lost the right to interfere, in any manner, with Frank & Co. in the subsequent disposition of the cotton: although the legal title, the right of possession and the actual possession were in Frank & Co., yet Heyner had an equitable right to any surplus that might remain after the satisfaction of the mortgage debt; and therefore it was to his interest that the cotton should be sold to the best advantage. Frank & Co. acceded to his reasonable request; and the fifteen bales at Sunnyside were shipped, not by Heyner, but by Frank & Co. for their own account, and the ninety-five bales at Vaucluse were shipped by Heyner for account of Frank & Co. on the same day, by the same boat, consigned to the same factors, Chaffe & Sons. The conduct of both parties was, in all respects fair, reasonable, just and lawful, and in accordance with their respective rights and interests.
When the cotton was delivered to the carrier, and a bill of lading was signed, consigning the ninety-five bales to Chaffe & Sons “ for account of Frank & Co.,” the carrier became the bailee and agent of Frank & Co. for the special purpose of transportation, safe custody, and delivery, as consigned; and the relations of Frank & Co. as holders of the legal title, having the right of possession and actual possession, were in no manner changed. If Chaffe & Sons had accepted the consignment, they would have been bound to receive and sell the cotton as the property of Frank & Co. and to account to Frank & Co. for the proceeds; and when they refused to accept the consignment, they simply declined to become parties to the contract of affreightment, and agents for Frank & Co.; and they chose to be strangers to the bill of lading. The effect of this was not to impair in any respect the title and right of Frank & Co.; and the right of possession remained in the carrier, as bailee and agent of Frank & Co.
The case of Grove vs. Brien, 8 Howard, 429, would have been almost *619 identical with this, in fact, as it is in principle, if Chaffe & Sons had received and sold the ninety-five bales under the bill of lading and consignment. Brien was the proprietor of a foundry, near the Potomac, in Maryland; and he was indebted to Gilmor, of Baltimore, and to Grove and to Foule & Sons of Alexandria. He had been in the habit of shipping nails to Foule & Sons; and his indebtedness to them grew out of these transactions. He wrote them in February promising an early shipment of nails ordered by them. In March he shipped 500 kegs, taking receipt or bill of lading as follows :
“ Received, March 14,1843, of John McP. Brien, 500 kegs of nails, to be delivered to William Foule & Sons, Alexandria, D. 0., for the use of Robert Gilmor, Esq., Baltimore, in good order.”
As soon as the nails arrived Grove attached them in the hands of Foule & Sons. Gilmor became a party by leave of court; and he set up his right under the shipment, which was made on account of the indebtedness of Brien to him. Foule & Sons sold the nails in the usual course of business; and they claimed a lien on the net proceeds in their hands for the balance due them on previous dealing. The court decreed that Brien had no property in the hands of Foule & Sons subject to attachment; that Foule & Sons had no lien for the general balance due them; and that Gilmor was entitled to the net proceeds of the sales of the 506 kegs. On appeal, the Supreme Court of the United States affirmed this decree. Nelson, judge, delivering the opinion of the court, said, p. 438: “The delivery of the goods by Brien to the master, and the bill of lading taken in the name of Gilmor, for the purpose of securing to him an existing indebtedness, operated as a transfer of the legal title; and the shipment, therefore, was not only in fact, but in judgment of law' for and on his account. Gilmor was the consignor. The effect of a consignment of goods, generally, is to vest the property in the consignee; but if the bill of lading is special, to deliver the goods to A for the use of B, the property vests in B.” See Evans vs. Marlett, 1 Lord Raymond, 271; Sargent vs. Morris, 5 Eng. C. L. R., 283, cited by the court, and Lawrence vs. Minturn, 17 Howard, 107; Story on Agency, section 395.
And again, p. 439: “ The 500 kegs of nails in the hands of Foule & Sons, were not subject to attachment for the liabilities of Brien, as the title to the property had already passed to the defendant Gilmor; and Foule & Sons had no valid lien on them as consignees, for previous advances to Brien; as they were the agents to receive the goods on commission for sale, and were advised by the bill of lading and correspondence that they were shipped for and on account of Gilmor. Though the goods were delivered by Brien to the master for consignment, they were delivered as the property of Gilmor, and under circumstances, as we have seen, that had the effect to invest him with the title.” P. 439.
*620 By refusing to accept the consignment, Chaffe & Sons had the same rights, precisely, that any other creditor of Heyner had, and no more, with respect to this cotton. If there could have been any defect in the delivery to Prank & Co. at the gin house, the shipment by Heyner for account of Prank & Co., as was decided in Grove vs. Brien, and as Judge Story says in his work on Agency, section 395, vested the legal title in Prank & Co.; and that title was not dependent on any act of Chaffe & Sons. Their acceptance of the consignment would have compelled them to account to Prank & Co. for the proceeds: their refusal to accept did not divest the right and title of Prank & Co. The cotton had passed from the dominion and control of Heyner before it came within the territorial limits of the State of Louisiana; and the law of Louisiana begins to act upon property only when it comes into the State.
There is proof in the record that Chaffe & Sons knew of the relations between Heyner and Prank & Co. before they made any advances to Heyner. John Chaffe says he did not know of any recorded rights against Heyner’s property; but it was proven that the contract of 10th July was exhibited to Chaffe & Sons before they made advances; and it is marked on its face “Second Lien,” which was sufficient to charge them with notice of a prior lien on the crop. According to the decision of the Supreme Court of the United States, in Butt vs. Ellett, 19 Wallace, this would have made them trustees of Prank & Co., and liable for the proceeds up to the amount of the mortgage debt, if Heyner had shipped the whole of the cotton to them, without mentioning in the bill of lading that ninety-five bales were for account of Prank & Co.
It is well established in our law, it must be the law every where, that where the owner of property has lost his control over it, and cannot change its destination, his creditors cannot attach it; and it is obvious that Heyner could not at any time after the delivery at the gin house, or the signing of the bill of lading, without gross wrong, if not crime, have changed the destination of the ninety-five bales of cotton; or have conferred upon any person whomsoever any right or title adverse to that of Prank & Co. See Trufton’s case, 12 Martin; 4 N. S. 667; 7 N. S. 139, and other cases cited; 1 Hennen, p. 135, No. 2.
Undue importance is attached to the question as to whether this cotton was at the risk of Heyner or of Prank & Co. The legal title, the right of possession and actual possession may be perfect; and yet may be entirely separate and distinct from the risk. In Conard’s case, 1 Peters, if the goods at sea had perished, the loss would have fallen on the person who transferred the bill of lading as security for debt; and yet Judge Story, the organ of the court, said the transferee was the owner. In Gibson vs. Stevens, if the pork and flour had been destroyed in the warehouses, the loss would have fallen on McQueen, to whom *621 Gibson made the advances; and yet Chief Justice Taney, the organ of the court, said Gibson was the owner, and could not be disturbed in his right of possession by attaching creditors. In Grove vs. Brien, if the nails had been sunk in the Potomac, the loss would have fallen on Brien; but Judge Nelson, the organ of the court, called Gilmor, for whose use Brien shipped them, the owner; and in Holliday vs. Dunnica, if the corn had been lost on the voyage, the loss would have fallen on Sherwood, Karnes & Co.; and yet Judge Davis, the organ of the court, did not hesitate to call Hamilton & Dunnica, the consignees, who had made advances on the faith of the bill of lading, the owners; and to say that if Hamilton & Dunnica had bought the corn outright they could not have acquired a better legal title.
It is obvious that where goods are transferred as “ security” for a debt, not “in payment,” the risk is with the transferrer; and the legal title is in the transferee. If the goods be lost, without fault on the part of the transferee, the mortgagee, the pledgee, the debt can not be paid out of the proceeds; and the transferrer remains indebted as he was ab origine.
In Hepp vs. Glover, 15 La., this court declared, as all other courts in the United States hold, that the attaching creditor can acquire no greater rights to the property attached than the debtor himself has ; and in Deloach vs. Jones, 18 La., where cotton, pledged to a bank as security for a debt in Arkansas, was shipped by the agent of the bank to this market, the court held that the right and title acquired under the law of Arkansas, before the cotton left the State of Arkansas, must be respected and enforced in Louisiana.
If our laws and our courts do not respect and enforce rights acquired in other States, between the citizens of those States, with respect to property in those States, which comes within the territorial limits of Louisiana only when it is impressed with such rights by the lex loci domicilii et contractus, et rei sitae, those having property, either holding as owners absolutely, or as security for debt, will hesitate to place it within our territorial limits, unless they know enough of our law to be assured that the title is one which our law would consider perfect with respect to property which had never been beyond the limits of Louisiana.
In Wilson vs. Lizardi, 15 La. 255, a debtor placed drafts for collection in the hands of his factors in New Orleans, with instructions to remit the proceeds to his creditors in London. Blainly neither the title nor the possession, nor the right of possession, passed to the London creditors; and the drafts and the proceeds in the hands of the factors, the agents of the debtor, were subject to attachment at the suit of his other creditors.
*622 In Beirne vs. Patton, 17 La. 589, cotton, and tobacco in the hands of New Orleans factors, belonging to a citizen of Tennessee, were conveyed by him, in the State of Tennessee, to other citizens of Tennessee, in trust for the benefit of other citizens of Tennessee, his creditors, some of whom were to be paid by preference out of the proceeds. The factors had notice, and agreed to hold subject to the order of the assignees, or trustees. Beirne attached, subsequently, in the hands of the factors; and the trustees intervened, and claimed to be put in possession under the deed. This court held that the deed of trust would be void under our law, as made in fraud of creditors; “ and there is no legal evidence that it would be valid under the laws of Tennessee.”
The court recognized the principle that all contracts in regard to personal property must be regulated by the lex loci domicilii of the owner. But this property came to Louisiana impressed with no other rights than those of the owner. Insolvent, while the property was in Louisiana, in the hands of his agents, for sale for his account, he made a transfer, not to any creditor, but to trustees for the benefit of his creditors, establishing a preference among them which was fraudulent and void by our law, and not shown to be valid by the lex domicilii. Of course there can be no question that the property was subject to attachment at the suit of a Louisiana creditor. The court properly held that the trustees acquired no beneficial title in themselves, and might well be viewed as the agents of the insolvent debtor to distribute the property according to his instructions.
• In Hughes vs. Klingender, 14 An. 52, a British ship was conveyed in England to a trustee for the purpose of securing a debt to the Bank of Liverpool. She came to New Orleans in the possession of the grantor, the owner; and was attached by his creditors. The agent of the bank intervened, and claimed the right to bond the ship. The court held that the bank was not the owner: that the deed of trust could only give the bank a privilege; and that, as creditor and intervenor, the bank had not the right to bond, which belonged only to the defendant, or the owner, in an attachment suit.
In the same case, on its merits, the court said : “ The instrument offered in evidence, the conveyance to the trustee, has no analogy to any mode known to our law of affecting personal property for the security of debts. It purports to sell to one man, to protect the rights of a third person; and yet the vendor is to retain possession. The contract is not a sale, nor a pledge; for there is no delivery, which our law deems essential in order to perfect either contract as to third persons. As our law would not enforce a similar contract between our own citizens, if made here, it will not enforce it to defeat rights already acquired by the ■attachment under our own laws,” 14 An. 845.
*623 In Southern Bank vs. Wood, 14 An. 554, two ships at sea were conveyed, sold, by the owners living in the city of New York, to Wood & Champlin, of the same place, in trust to sell them, and "to pay the proceeds to creditors: and regular bills of sale, conveying the title to the •trustees, were executed.
The vessels were then on their way from Havre to New Orleans. On the arrival of one of them, the agent of the trustees, holders of the legal title, took possession; and when the other arrived, he gave notice to the master to give him possession under the title. Both vessels were attached by the bank as the property of the former New York owners, one of them after the agent had taken possession, the other before he had taken possession, having been attached in the river, before she reached the port. The court said:
“ The assignment and sales of these vessels did not, and could not, •conflict with our laws, because the vessels and the parties to these deeds were not within the dominion of the State when they were executed and the transfer took place; and the parties to the acts were citizens of New York, where such acts are lawful. P. 556.
“ Before the vessels arrived at New Orleans, and were attached, a perfect title existed in the trustees for the benefit of the preferred creditors; so that no conflict could arise between the laws of Louisiana and those of New York.”
Of course the title of the trustees, interveners, was maintained.
In Pall vs. Darden, 17 An. 236, Darden, a citizen of Tennessee, in that State sold a stock of goods to Hicks, also of that State. At the time of this sale part of the goods were at sea, in transitu, from Liverpool to New Orleans. Immediately on the arrival of the ship at New Orleans, before the agent of the vendees could get possession, plaintiff •a resident of this State, a creditor of Darden, attached the goods as his, property. Hicks intervened, claimed the goods, and recovered judgment for them. Affirming the judgment this court said:
“ By the laws of Tennessee, as proven, a sale of property without ■delivery is valid against the vendor’s creditors. * * * Had the goods •been in this State at the time of the sale, an attachment of them would have been sustained,.there being no delivery. * * * But the goods not being within this State at the time of the sale, our laws had no control over them; and their subsequent removal here cannot change acquired rights. The contract was complete by the laws of Tennessee; -x- * an¿ iex ioci contractus must govern.”
In Dobbin vs. Hewett, 19 An. 513, Hewett of Maine had mortgaged a ship to McLoan of the same State. She came to New Orleans and was attached as the property of Hewett. McLoan, the mortgagee, intervened; and proved that by the law of Maine, after default of pay *624 ment of the mortgage debt, at maturity,, the mortgagee of ships or other personal property becomes absolute owner, without delivery, subject to the right of the mortgagor to redeem within sixty days. As the debt had matured, and was not paid before attachment, this court held that the title of the tntervenor, the mortgagee, had become perfect by the law of Maine before the ship was attached; and that it must prevail.
These three decisions are in perfect accord with the jurisprudence of the Supreme Court of the United States, of the State of Arkansas,, and of the other States of the Union generally. In my opinion they rest upon principles which are too well established to be now questioned; and which are sound and wholesome; and I consider them determinative of the controversy in this case. I think the judgment of the district court should be amended as to the amount decreed against Heyner: that it should be reversed as to the intervenors Frank & Co.; and that we should declare and decree that the ninety-five bales of cotton were-not subject to attachment at the suit of creditors of Heyner.
DeBlanc, J. I concur in the foregoing opinion.